BRIAN D. LYNCH
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2155
Tacoma, WA 98402

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>CHARLES A. MCSWAIN and PHYLLIS M. MCSWAIN,<br><br>Debtors. | Case No. 07-43338 |
| TRYNA NORBERG,<br><br>Plaintiff,<br><br>v.<br><br>HAWKS PRAIRIE CASINO, LLC, a Washington limited liability company; DIORITE INVESTMENTS, LLC, an Arizona limited liability company; DAVID MATHIESON and CAROL MATHIESON, husband and wife and the marital community composed thereof; JACK MATHIESON and HELEN MATHIESON, husband and wife and the marital community composed thereof; CHARLES A. MCSWAIN and PHYLLIS MCSWAIN, husband and wife and the marital community composed thereof; JOHN DOES 1—5 and JANE DOES 1—5,<br><br>Defendants. | Adversary No. 10-04107<br><br>**OPINION ON PLAINTIFF'S COMPLAINT FOR DECLARATORY RELIEF** |

THIS MATTER came before the Court on Tryna Norberg's Complaint for Declaratory Relief. Norberg seeks a declaratory judgment that Defendant Charles McSwain no longer possesses any management rights in Hawks Prairie Casino, LLC and that McSwain's interests are solely those of an assignee under Washington law and the Hawks Prairie operating agreement. Trial was held on September 1, 2011 and closing arguments were made on September 8, 2011. The Court heard testimony, admitted exhibits into evidence and took the matter under advisement. The Court has considered the arguments of counsel, reviewed all documents and pleadings on file, and is apprised in the premises. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law for

purposes of Bankruptcy Rule 7052.[1] A separate judgment will be entered in accordance with Bankruptcy Rule 7058(a). To the extent a Finding of Fact is a Conclusion of Law, or the converse, it is adopted as such.

**I. Jurisdiction**

This Court has jurisdiction under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B)(L) and (O). Venue is proper under 28 U.S.C. § 1409.

**II. Procedural History**

Plaintiff Tryna Norberg is an individual residing in Olympia, Thurston County, Washington. Defendant Hawks Prairie Casino, LLC is a limited liability company that was organized on July 30, 1998 under the laws of Washington and has its principal place of business in Lacey, Thurston County, Washington, where it operates a casino. Defendants Charles McSwain and Phyllis McSwain ("McSwain") and the marital community composed thereof are residents of Olympia, Thurston County, Washington and filed an answer and affirmative defenses to Norberg's complaint. Defendants Diorite Investments, LLC; David Mathieson and Carol Mathieson; Jack Mathieson and Helen Mathieson; and Christopher Buitron have failed to answer or otherwise appear in this proceeding.

McSwain filed a voluntary Chapter 11 petition on October 7, 2007 and scheduled his Hawks Prairie membership interests on Schedule B as personal property. On November 11, 2009, McSwain filed a plan of reorganization containing the following provision:

> Confirmation of the Plan shall automatically reinstate all of the Debtors' legal, equitable and other rights and Interests as existed immediately prior to the Petition Date with respect to Debtors' Interests in … Hawks Prairie Casino, LLC.

On December 7, 2009, Hawks Prairie objected to confirmation based on paragraph 11.1 of the plan, on the grounds that paragraph 11.1 was inconsistent with the Hawks Prairie Operating Agreement and applicable law and would impermissibly reinstate McSwain as a member with full management rights. Hawks Prairie argued that the Operating Agreement and Washington law are

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101—1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001—9037.

clear that a member filing bankruptcy attains the status of an assignee without management rights. The Court ultimately confirmed the plan, but the confirmation order provided that:

> … to the extent Hawks Prairie Casino, LLC or any of the individual members thereof seek to contest the revesting of assets pursuant to Article 11.1 of the Plan, such parties must commence an adversary proceeding in this bankruptcy case within 30 days of the entry of this Order or such provisions of the Plan shall be finally determined as fully binding and enforceable.

*See* Order Confirming Plan of Reorganization, Case No. 07-4338, Docket No. 152, ¶ 2.

Norberg timely filed this adversary complaint[2] and, in due course, a subsequent motion for summary judgment, which the Court denied on July 25, 2011. The summary judgment order held that "the parties agree that the Operating Agreement is an executory contract," and noted that "§ 365(c)(1) would ordinarily preclude McSwain as the debtor-in-possession from assuming or assigning the Operating Agreement because applicable bankruptcy law makes the contract nonassignable." Order Denying Plaintiff's Motion for Summary Judgment, Docket No. 75, Page 5, Lines 23—25 (relying on *Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)*, 165 F.3d 747, 754-55 (9th Cir. 1999) and *In re First Protection, Inc.*, 440 B.R. 821, 830 (B.A.P. 9th Cir. 2010) (noting that "[i]f the operating agreement is an executory contract … § 365 governs the trustee's rights rather than "§ 541(c)(1)")). However, the Court determined summary judgment was not appropriate because there was an "issue of material fact as to whether Norberg waived her right to enforce the dissociation provisions against McSwain by allowing him to participate in the management of Hawks Prairie for more than nineteen months after his petition was filed." *Id.*, Page 3, Lines 6—9.

After summary judgment and before trial, McSwain filed a motion for partial reconsideration of that portion of the summary judgment order stating that the parties agreed that the Operating Agreement is an executory contract. McSwain argued he had not agreed that the Operating Agreement was an executory contract and requested the opportunity to present further evidence and argument on the issue. *See* Motion for Reconsideration, Docket No. 81, Page 2, Lines 2—7.

---

[2] None of the other Hawks Prairie members challenged the revesting of assets under the Plan and they have therefore waived their rights to enforce the dissociation provisions against McSwain.

**III. Facts**

*a. History of Hawks Prairie Casino, LLC and the Operating Agreement*

Hawks Prairie was organized on or about July 30, 1998. McSwain and Norberg were among the initial members of the company. On or about August 8, 2001 the then-members of Hawks Prairie executed an amended and restated Operating Agreement. The current holders of the Hawks Prairie equity interests and their respective ownership percentages are as follows:

- McSwain – 52.5517%
- Norberg – 23.0364%
- David and Carol Mathieson – 6.8807%
- Jack and Helen Mathieson – 6.8807%
- Diorite Investments – 4.8082%
- Christopher Buitron – 2.8423%

The Operating Agreement requires approval by Members holding more than 50% of the units before taking any action set forth in Section 3.2 of the Operating Agreement; it requires approval by Members holding more than 70% of the units before taking any action set forth in Section 3.3. The Operating Agreement requires that meetings be noticed and held in accordance with Section 4 of the Operating Agreement. Section 15 of the agreement provided that Hawks Prairie Casino will be terminated and dissolved if an "Event of Dissociation" occurs, unless 50% of all remaining Members consent in writing within 90 days to continue the business of the company.

The Operating Agreement defines an "Event of Dissociation" to include a member filing a voluntary petition for bankruptcy petition, unless done in accordance with the terms of the Operating Agreement or with the written consent of all the other Members. Section 9.3 of the Operating Agreement provides that if an Event of Dissociation occurs and the business of the company is continued, "the successor to the Units held by the Member will be treated as an assignee of such Units and not as a Member, unless admitted as a substitute Member in accordance with Section 9.6." Section 9.6.1 of the Operating Agreement states that "[n]o assignee of Units who is not already a

Member may become a Member unless and until the Required Interest consents in writing to the admission of such person as a substituted Member, which consent may be withheld in the absolute discretion of the Members." The "Required Interest" is defined as 70% of the initial members of Hawks Prairie. Section 9.6.5 of the Operating Agreement states that "[u]nless and until an assignee of Units becomes a substituted Member, the assignee may not be treated as a Member and has only the rights to share in the Net Income and Net Losses."

Section 3.1 of the Operating Agreement states that "[e]xcept as provided in Section 3.2, or otherwise explicitly provided in this agreement, the business and affairs of the Company shall be managed by the Majority Interest or the Required Interest." Members are obligated to vote on the "Major Decisions" of Hawks Prairie under Section 3.2. "Initial Members," including Norberg and McSwain, are obligated to vote on "Initial Member Decisions" of Hawks Prairie under Section 3.3. Section 3.4 provides that Members are obligated to vote on "Disinterested Decisions." The Operating Agreement contains a mandatory capital contribution provision in Section 5. Members are affirmatively restricted from engaging in unauthorized transfers of their membership interests under Section 10, and from competing with Hawks Prairie or disclosing Hawks Prairie's confidential business information under Section 12.

b. *McSwain's Bankruptcy Petition*

McSwain filed a voluntary Chapter 11 petition on October 7, 2007. At no time prior to October 7, 2007 did Hawks Prairie or its members consent to McSwain filing for bankruptcy protection, as contemplated under the Operating Agreement. At no time on or after October 7, 2007 has Hawks Prairie or its members held a vote to treat McSwain as a Member or substituted Member of the company, as contemplated under the Operating Agreement. On May 22, 2009, Hawks Prairie held a meeting and informed McSwain that he was dissociated from the company. This meeting occurred a few months after McSwain called upon Norberg to resign as President of Hawks Prairie and told her he would call a meeting to appoint a new president if she refused to step down of her own accord.

After May 22, 2009, McSwain stopped receiving all company correspondence, minutes of meetings or other company information directed to members, despite the fact he had received all such material between October 7, 2007 and May 22, 2009. In addition, Hawks Prairie was not terminated or dissolved after McSwain filed his petition despite the fact that no members consented in writing within 90 days to continue the business of the company, as contemplated by Section 15 of the Operating Agreement.[3].

Norberg became aware of McSwain's bankruptcy filing shortly after it occurred. She closely followed the activities in McSwain's case and sent the other Hawks Prairie members, including McSwain, multiple pieces of correspondence in which she reminded them that McSwain was in bankruptcy. For example, on November 8, 2007 she sent a letter to "all LLC members" stating that "Chuck has filed for bankruptcy," and that "now we are in a waiting period as Chuck works through the process." On January 30, 2008 Norberg sent a letter to all members in which she stated: "Chuck is still in the Chapter 11 process." She sent a similar letter on March 14, 2008. On June 10, 2008 she sent an email to Hawks Prairie members stating: "Chuck is still proceeding through Chapter 11. Chuck believes he will be able to stay in Chapter 11, as of last week. I keep updated on Chuck's bankruptcy weekly through [Hawks Prairie's attorney]." Each of these pieces of correspondence addressed to "all members" was sent to McSwain. Norberg claims this correspondence was directed to McSwain in his purported capacity as an "economic interest holder," rather than as a member, but the Court does not find this self-serving testimony credible. The correspondence does not, for example, refer to "all members, and Charles McSwain, as an assignee of membership interests," or the like. The better understanding is that Norberg regarded McSwain as a full member.

---

[3] There is precedent for a Hawks Prairie member filing for bankruptcy without being immediately dissociated or forcing the winding down of the casino. Christopher Buitron had filed for bankruptcy but, despite the fact that Hawks Prairie did not call a meeting within 90 days to obtain members' written consent to continue the business, the casino continued to operate as though nothing had happened.

Norberg is very familiar with all of the terms and provisions of the Operating Agreement. She had full knowledge upon learning of McSwain's bankruptcy petition that she was entitled to treat him as an "Assignee" under the Operating Agreement. She testified she knew "from the very beginning" that he was an assignee. However, from and after the bankruptcy filing, McSwain continued to be fully involved in all activities of Hawks Prairie and its management and Norberg treated him as a full member until May 22, 2009. Norberg, as President of Hawks Prairie, allowed McSwain to participate fully in managing the company and to exercise all membership rights, including the right to vote. McSwain voted at each and every company meeting and participated in votes by the members between October 7, 2007 and May 22, 2009.

For example, McSwain attended and participated in a June 2, 2008 company meeting and cast three votes: (1) he voted "yes" on a matter that "[p]assed by over 70% and on which all members other than Norberg and McSwain abstained;" (2) he voted in favor of purchasing a player tracking system for the casino; and (3) he voted "yes" on the Westside Lanes transaction, which also "[p]assed by over 70%" and on which all members other than Norberg and McSwain voted no.[4] Under Section 3.2.4 of the Operating Agreement, the Westside Lanes transaction required the approval of 70% of the Units because it entailed Hawks Prairie incurring $185,000 in new debt. Since only Norberg and McSwain voted in favor of the deal, it could not have been consummated without McSwain's yes vote.

As another example, McSwain attended and participated in a May 15, 2008 meeting and remained in the room when non-members in attendance were asked to leave "as the rest of the meeting would be private." Norberg argues that these were not formal votes and that McSwain was simply "agreeing," consistent with his status as an assignee and economic interest holder. However,

---

[4] The 70% figure is critical to understanding that McSwain participated in these meetings as a voting member and that Norberg treated him a full member. Since McSwain owns about 53% of the company, and Norberg owns about 23%, the 70% figure can only be arrived at if their votes are combined. Even assuming that McSwain's "vote" was only advisory and without corporate force, Norberg would be unable to reach the 70% by herself. Taking McSwain's voting percentage out of the picture leaves her with only 55%. See Exhibit P81.

as with the correspondence to "members," the Court affords little weight to her self-serving testimony, particularly since it is at odds with the contemporaneous minutes of meetings and other documents.

McSwain voted as a member in other matters. For example, on June 10, 2008 he sent Norberg an email stating that he voted against a $50,000 cash distribution to members. On June 11, 2008 he sent the Hawks Prairie members an email outlining why he was voting against the distribution and stated: "…making distributions requires a vote of the membership. Tryna believes she can proceed with no vote. I have voted no to this distribution." The other Hawks Prairie members voted yes to the distribution but, as Norberg explained in an August 13, 2008 letter to the members, a distribution required over 50% approval and "Chuck voted no to the distribution." It is clear that Norberg thought (1) that McSwain was a member with 53% of the voting rights and (2) that since he had voted no, the distribution could not proceed, even if the other members favored the distribution. If McSwain had been a non-voting assignee, he could not have stopped the distribution.

McSwain also participated as a member in Hawks Prairie activities that were unrelated to the exercising of voting rights. For example, he worked with Norberg to come up with a buyout plan to purchase the membership interests of Dave Mathieson and Jack Mathieson. He participated in evaluating Hawks Prairie's banking procedures and attempting to strengthen the casino's banking relationships. Norberg argues this does not prove McSwain was a member because he was simply an "ideas man" without the corporate authority to carry out these activities by himself, and that she had not authorized McSwain to investigate alternative banking arrangements. However, she also admits that she alone, and no other member, possessed the corporate authority to obligate Hawks Prairie on contracts or business relationships. The Court finds that McSwain's participation in these non-voting activities buttresses, but does not alone establish, that Norberg regarded and treated McSwain as a full member with management duties.

**IV. Conclusions of Law**

*a. The motion for partial reconsideration of the summary judgment order is denied.*

Reconsideration under Bankruptcy Rule 9023, incorporating Federal Rule of Civil Procedure 59, is appropriate if the moving party demonstrates (1) manifest error of fact; (2) manifest error of law; or (3) newly discovered evidence. *Hale v. United States Trustee (In re Basham)*, 208 B.R. 926, 934 (9th Cir. 1997), *aff'd*, 152 F.3d 924 (9th Cir. 1998). Local Civil Rule for the U.S. District Court for the Western District of Washington 7(h), made applicable in this court by Local Bankruptcy Rule 9013-1(h) provides:

> Motions for reconsideration are disfavored. The Court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence.

Local Rules, W.D. Wash. CR 7(h).

The Court concludes that reconsideration of its order is not warranted under Rule 59(e). It is true that McSwain's response in opposition to Norberg's motion for summary judgment states only: "*if* the Agreement is an executory contract;" "whether or not the Agreement is an executory contract;" and "if [the Agreement] is treated as an executory contract." It is also true that none of these statements should be read as conceding that the Hawks Prairie Operating Agreement is an executory contract.

However, reconsideration is not warranted because McSwain has failed to show manifest error of law in the summary judgment order, even if the Court incorrectly stated that the parties "agreed" as to its executoriness. A bankruptcy court may determine whether the Operating Agreement is an executory contract as a matter of law. *In re Innovative Commc'n Co.*, LLC, 399 B.R. 152, 156 (Bankr. D.V.I. 2008) (noting issue of executoriness of contract was issue of law reviewed on appeal under *de novo* standard). The Operating Agreement contains multiple, mutual obligations between and among the parties that satisfy the Countryman definition of an executory contract. For example, McSwain had ongoing management obligations to Hawks Prairie, as set forth in Section 3.1 of the Operating Agreement. He was obligated to vote on Major Decisions, Initial Member Decisions and Disinterested Decisions of Hawks Prairie under Sections 3.2, 3.3 and 3.4, respectively. He was obligated to vote on and contribute mandatory additional capital contributions pursuant to Section 5. He was affirmatively

restrained from restricted from engaging in unauthorized transfers of his membership interests under Section 10, and restricted from competing with the company or disclosing its confidential information under Section 12. Finally, he was affirmatively restricted from voluntarily withdrawing as a member.

These provisions are hallmarks of executory contracts for LLC agreements. *See, e.g., Movitz v. Fiesta Investments, LLC (In re Ehmann)*, 319 B.R. 200, 205 (Bankr. D. Ariz. 2005) (citing obligations to contribute capital and continuing fiduciary obligations among members as obligations that would make an operating agreement executory); *In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 708-09 (Bankr. E.D. Va. 2000) (operating agreement was not executory because it did not impose ongoing obligations for members, including obligations to provide additional capital, obligations to participate in management, and restrictions on voluntary withdrawal). Thus, even if McSwain did not agree the Operating Agreement is executory, reconsideration is not warranted because he has not shown manifest error of law in the Court's prior ruling. The Operating Agreement is an executory contract.

   *b. Section 365(c)(1), not § 541(c)(1), is likely applicable to the Operating Agreement, but the Court need not reach the issue of whether McSwain, as debtor-in-possession, could assume the Operating Agreement.*

The parties agree with each other that § 541(c)(1) is applicable to the Operating Agreement, but draw different conclusions therefrom. McSwain argues that the entirety of his economic and management interests became property of the estate under § 541(c)(1), which trumps state and contractual law purporting to divest him of management rights. In support, he cites to *First Protection, Inc.*, 440 B.R. at 830 (holding that "all of Debtors' contractual rights and interest … became property of the estate under section 541(a)(1) by operation of law when they filed their petition."); *Ehmann*, 319 B.R. at 206 (noting that § 541(c)(1) renders inapplicable limitations and restrictions in the LLC operating agreement and Arizona statutory law); and *In re Klingerman*, 388 B.R. 677, 679 (Bankr. E.D.N.C. 2008) (same).

Norberg similarly urges the Court to hold that all rights and privileges McSwain had as a member immediately before filing became property of the estate under § 541(c)(1)—but argues that since he had been divested of management rights before filing by operation of law, the estate received

only his economic interest. In support, she points to *Garrison-Ashburn, L.C.*, 253 B.R. at 708 (noting that "[debtor's] interest in [the LLC], both his membership interest and his non-economic rights and privileges as a member, became property of the bankruptcy estate," but enforcing a statutory dissociation provision).

However, the cases cited by the Parties do not deal with executory contracts. See *Id.* at 831 ("application of an executory contract analysis in this context does not make sense"); *Klingerman*, 388 B.R. at 679 (applying a § 541 analysis without considering whether the contract was executory); *Ehmann*, 319 B.R. at 205-06 ("it is difficult to see where an executory contract lies"); *Garrison-Ashburn*, 253 B.R. at 709 ("in the circumstances of this case, there is no executory contract"). As set forth in the summary judgment order, the Court concludes that § 365, as opposed to § 541, governs McSwain's ability to assume this executory contract. "[I]f the operating agreement is an executory contract … § 365 governs the trustee's rights rather than § 541(c)(1). In that event, the restrictive provisions under [state law] or the operating agreement that affect the transfer of Debtors' rights and interests in [the LLC] may be enforced through the operation of § 365 in some instances." *First Protection*, 440 B.R. at 830-31 (in dicta).

The *First Protection* dicta regarding LLC operating agreements is consistent with the Ninth Circuit's broader holding regarding executory contracts in *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir. 1999) that "where applicable nonbankruptcy law makes an executory contract nonassignable because the identity of the nondebtor party is material, a debtor in possession may not assume the contract absent consent of the nondebtor party." *Id.* at 755-56. The Court reads *Catapult* as requiring three elements that must be met before a bankruptcy court may enforce dissociation provisions against an LLC member who files for bankruptcy: (1) the LLC agreement must, in fact, be an executory contract; (2) applicable nonbankruptcy law must forbid the contract's assignment; and (3) assignment must be forbidden because the identity of the nondebtor party is material. To put it another way, First Protection's use of the phrase "in *some* instances" when discussing whether applicable law

precludes assumption of an LLC operating agreement should be interpreted to mean instances in which all three *Catapult* elements are present.

Here, the Hawks Prairie Operating Agreement meets the first two elements. As noted above, the Operating Agreement is an executory contract. Furthermore, applicable nonbankruptcy law forbids its assignment. See RCW 25.15.250(2) (statutory dissociation provision); RCW 25.15.260(1) (substitution of members); and Sections 9.3 and 9.6.1 of the Operating Agreement (regarding contractual dissocation provision and substitution of members). It is certainly possible that the identity of Hawks Prairie's other members is material, such that McSwain could not assume the contract. However, given Norberg's waiver, discussed *infra*, the Court need not determine whether this is in fact the case. Even assuming their identities are *not* material, such that McSwain could assume the Operating Agreement, Norberg's waiver moots the necessity of ruling on the matter.[5]

*c. Norberg waived her right to enforce the dissociation provisions against McSwain*

The implied waiver of contractual rights is not favored under Washington law. *Oregon Mut. Ins. Co. v. Barton*, 109 Wn. App. 405, 418 (2001). There must be unequivocal acts or conduct evincing intent to waive and waiver will not be inferred from doubtful or ambiguous factors. *Central Washington Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 354 (1989). In the absence of waiver by express agreement, "waiver by conduct occurs if the actions of the person against whom waiver is claimed are inconsistent with any intention other than waiver." *Edmonson v. Popchoi*, 155 Wn. App. 376, 390 (2010), aff'd, 256 P.3d 1223 (2011). The Court concludes that Norberg impliedly waived her right to

---

[5] The Court acknowledges this position is somewhat at odds with the summary judgment Order, which stated: "McSwain, in his capacity as debtor-in-possession, would normally be prohibited from assuming the Operating Agreement as a matter of law." Upon further consideration, the Court is not convinced that McSwain would be precluded from assuming the Operating Agreement as a matter of law. A *per se* rule against the assumption of LLC operating agreements by debtors in possession would implicate a broad swath of cases in which the identity of the nondebtor party might not be material (for example, if the LLC had many passive members, akin to investors in a corporation). *First Protection's* dicta is not binding, and *Catapult* relied on the fact that "federal patent law makes nonexclusive patent licenses personal and nondelegable." 165 F.3d at 750. Given Norberg's waiver in this case, it is not necessary to fashion new case law on the assumption of LLC operating agreements under § 365 and the Court declines the opportunity to make a more expansive ruling than necessary.

enforce the Operating Agreement's dissociation provisions against McSwain. In fact, the Court is convinced that more convincing case of implied waiver of contractual rights would be hard to find.

Norberg testified that she knew from the very beginning that McSwain could be treated as an assignee under the Operating Agreement. She was fully aware of his bankruptcy filing and kept other Hawks Prairie members abreast of progress in his case. In spite of that knowledge, she permitted McSwain to exercise all the rights of a full member, including the right to vote, and treated him as a full member in her dealings with other members and the world at large. McSwain attended management meetings and voted on corporate transactions, including providing the necessary vote to allow the company to assume a debt in excess of $100,000 as part of the Westside Lanes acquisition. That vote required 70% of units and only Norberg and McSwain voted in favor. Norberg sent out multiple emails, letters and minutes of meetings that referenced McSwain as a "member." Norberg's conduct constitutes "unequivocal acts or conduct evincing intent to waive;" there is nothing ambiguous or doubtful about it. *Oregon Mut. Ins.*, 109 Wn. App. at 418.

Norberg urges this Court to hold that her actions are consistent with her contemporaneous intention to treat McSwain solely as an economic interest holder and assignee. The Court disagrees. Aside from her self-serving testimony at trial, there is absolutely no evidence that Norberg treated or regarded McSwain as an assignee and economic interest holder at any point leading up to the May 22, 2009 meeting. She instead treated him as a full member for many months, in the full knowledge that she was entitled to treat him as an assignee. Her actions were "inconsistent with any intention other than waiver." *Edmonson*, 155 Wn. App. at 390.

*d. McSwain's other affirmative defenses are unavailing.*

In addition to waiver, McSwain relies on three other affirmative defenses: (1) that the confirmation order in McSwain's Chapter 11 case bars the relief sought in this adversary proceeding; (2) estoppel; and (3) ratification. None of these defenses are availing.

With respect to the confirmation defense, the Court already held in its summary judgment order that "Norberg successfully preserved her ability to challenge the revesting of the management rights

under the plan." Order Denying Plaintiff's Motion for Summary Judgment, Docket No. 75, Page 4, Lines 3—4. Thus, this defense must fail.

Equitable estoppel requires reasonable reliance on a party's words or conduct and a resulting detrimental change in position. *See Lone Star Security & Video, Inc. v. Gurrola (In re Gurrola)*, 328 B.R. 158, 172 (B.A.P. 9th Cir. 2005). It is clear that McSwain relied on Norberg's conduct in treating him as a member: he continued to attend company meetings, he voted on various matters and he continued to act as a full member of the company. This reliance was reasonable because Norberg treated him a member and gave him no indication that she regarded him as an assignee or economic interest holder. However, McSwain did not detrimentally rely on Norberg's conduct. His participation as a member does not constitute reliance and a detrimental change in position. McSwain's self-serving testimony that he would not have participated in the affairs of Hawks Prairie does not justify the application of estoppel because he failed to show how a detrimental change in position. In fact, after receiving formal notice of his dissociation on May 22, 2009, McSwain continued to ask to participate in Hawks Prairie's affairs.

"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act … is given effect as if originally authorized by him." *In re Eicholz*, 310 B.R. 203, 207-08 (D. Wash. 2004) (quoting *Riss v. Angel*, 131 Wn.2d 612, 636 (1997)). The Court concludes that in no way can McSwain's bankruptcy filing be viewed as something done on behalf of Norberg, Hawks Prairie or any other member. There is no evidence that Norberg or any other member ratified his filing such that it would no longer constitute an event of dissociation under the Operating Agreement. Hawks Prairie and its members have never held a vote to treat McSwain as a member or substituted member of the company. The defense of ratification does not apply in these circumstances.

**V. Conclusion**

Norberg has failed to show her entitlement to a declaratory judgment that McSwain no longer possesses any management rights and is solely an economic interest holder in Hawks Prairie. She

waived her right to enforce the dissociation provisions by treating him as a full member for more than nineteen months. The provisions of McSwain's Chapter 11 plan which purport to revest him with all "legal, equitable and other rights and Interests as existed immediately prior to the Petition Date with respect to Debtors' Interests in … Hawks Prairie Casino, LLC" are fully binding, enforceable and proper. Under Washington law and the Hawks Prairie Operating Agreement, McSwain is entitled to exercise his full management and other membership rights in Hawks Prairie Casino, LLC.

// End of Opinion //

Brian D. Lynch
United States Bankruptcy Judge
(Dates as of Entered on Docket date above)